860 So.2d 180 (2003)
STATE of Louisiana
v.
Jonathan JOHNSON.
No. 03-KA-620.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 2003.
*183 Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Appellant.
Jonathan Johnson, Angola, LA, Defendant/Pro Se.
Paul D. Connick, Jr., District Attorney, 24th Judicial District, Parish of Jefferson, State of Louisiana, Terry M. Boudreaux, Appellate Counsel, Thomas J. Butler, Counsel of Record on Appeal, Walter G. Amstutz, Trial Counsel, Assistant District Attorneys, Gretna, LA, for Appellee.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and CLARENCE E. McMANUS.
JAMES L. CANNELLA, Judge.
The Defendant, Jonathan Johnson, appeals from his conviction of armed robbery and enhanced sentence, as a third felony offender, of 66 years at hard labor. We affirm.
On June 6, 2002 the Defendant was charged with armed robbery, a violation of La.R.S. 14:64, and pled not guilty at arraignment.[1] On December 18, 2002, a 12 person jury found the Defendant guilty as charged. On January 23, 2003, he was sentenced to 41 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On the same day, the State filed a Habitual Offender bill of information alleging the Defendant to be a third felony offender. The Defendant denied the allegations in the bill of information and on February 19, 2003 a hearing was conducted in which the trial judge found the Defendant to be a third felony offender. On February 25, 2003, the trial judge vacated the original sentence and sentenced the Defendant to 66 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
On May 6, 2002, at approximately 9:00 a.m., two black men wearing bandanas over their faces entered the Eureka Homestead on Veterans Boulevard in Metairie, Louisiana. One of the men leaped over the counter and placed a gun to the head of a teller, Deanna Barrileaux (Barrileaux), and demanded money. She handed the man approximately $600, all of the cash in her drawer. The other man entered the office of Margo McKee (McKee) where she and another teller, Monica Campos (Campos), were working on the computer. McKee testified that the man pointed a gun at her and told her to put her hands where he could see them. The man further instructed her not to push any buttons, or he would kill her. McKee told the man that there was no money in the office and yelled to Barrileaux to give the men whatever they wanted. Campos testified that she did not recall seeing a gun in the hand of the man in the office, but she assumed that he had one since he threatened her and McKee. A short while later, one of the men yelled, "Let's go," and the two fled on a red motorcycle.
That morning, Detective Sergeant Rotherham of the Jefferson Parish Sheriff's Office (JPSO) was driving his unmarked police car east on I-10 on his way to a funeral. He had just passed the Bonnabel Boulevard exit when he saw a small red motorcycle squeeze between his car and the car to his right. This caught his attention and he noticed that the motorcycle was occupied by two black men wearing dark clothing with bags slung over their *184 shoulders. Detective Rotherham further observed that the passenger was wearing a bandana around his neck. All of these circumstances aroused Detective Rotherham's suspicions and, at approximately 9:15 a.m., he turned on his police radio. Shortly thereafter, Detective Rotherham heard that Eureka Homestead had been robbed and that two black men had fled on a red motorcycle toward the interstate. Detective Rotherham radioed headquarters that he had spotted two men on a red motorcycle and requested assistance from the New Orleans Police Department (NOPD) to intercept the motorcycle. Detective Rotherham continued to follow the men into New Orleans, trying not to alert them. When they exited the interstate at Carrollton Avenue, they sped up and he thought they had noticed his pursuit. He then activated his lights and siren. The pursuit continued until the motorcycle reached the intersection of South Dupre Street and Earhart Boulevard where either intentionally or accidentally, the bike fell over. Both men immediately fled, climbing over a nearby fence with barbed wire at the top that was overgrown with vines. Detective Rotherham was able to follow the men along the fence line in his car. The Detective kept both men in sight and at one point came face to face with them through the fence. He identified himself and told them to freeze, but they turned around and started running away from him. Detective Rotherham was able to continue to follow the men driving along the fence line. He only lost sight of them once for a few seconds. They eventually went in different directions, but Detective Rotherham saw the Defendant go into an area of apartments with overgrown weeds and broken concrete. The area provided cover for the fugitives and the Detective kept watch on the area while he waited for the NOPD officers and JPSO deputies to arrive. The other officers arrived shortly, surrounding the block, and a canine unit was brought in to search. The police dog discovered the Defendant, whom Detective Rotherham later identified as the driver of the motorcycle, at the top of a staircase at 4108 Clio Street. The Defendant surrendered when the Orleans Parish canine officer said he was releasing the dog. The other man, whom Detective Rotherham later identified as the passenger, emerged from his hiding place under some stairs at a warehouse when a Jefferson Parish helicopter hovered over the area.
During the chase, the men discarded the bags that they were carrying. The police found the bags, but they were empty. The police did not find any guns or money during the search of the area.
When apprehended, the Defendant was wearing a T-shirt and grey shorts. However, Detective Rotherham testified that he found a pair of blue jeans in an alley near the location where the Defendant had been hiding. According to Detective Rotherham, the Defendant was wearing these jeans, a button-down black and white shirt and black shoes during the pursuit.
Although none of the Eureka Homestead witnesses could identify either of the robbers because their faces were covered, Barrileaux and McKee positively identified photographs of the red motorcycle as the get-away motorcycle. Barrileaux identified the tennis shoes worn by the robber who leapt the counter. At trial, it was stipulated that a shoe print expert would have testified that the shoe prints left on the counter was similar to the prints made by the shoes offered by the State. Bonnie Dubourg, a DNA expert, testified that she had compared the Defendant's DNA and DNA obtained from the jeans and linked the jeans to the Defendant.
Chambliss pled guilty before the Defendant's trial and testified for the State that *185 he went into the office at the bank, while the Defendant hopped the counter and robbed Barrileaux at gunpoint. He also claimed that he had no weapon and that the Defendant's gun was a B.B. gun that resembled a .45 caliber weapon. Chambliss admitted that he made a statement to the police that the Defendant had committed the armed robbery, Chambliss also acknowledged that he had signed a hand-written affidavit rescinding the statement. However, Chambliss stated that he could not read and denied knowledge of the affidavit's contents. Further, Chambliss testified that he had pled guilty and had received a sentence of ten years imprisonment at hard labor without benefits. Chambliss acknowledged that part of his plea agreement was that he would receive a ten-year sentence if he cooperated with the State and a 12½ year-sentence if he did not.
The Defendant presented the testimony of three JPSO deputies who were at the scene during the search for the two men. Officer Gerald Pampin testified that he assisted the NOPD in setting up a perimeter. Crime Scene Technician Kevin Murphy testified that he secured the scene surrounding the fallen motorcycle. Detective John Carroll testified that when the dog discovered the Defendant's scent, it went up the stairs where the Defendant was hiding and retrieved the jeans. Detective Carroll also stated that the Defendant surrendered and came down the stairs when the canine officer said he was sending up the dog. Detective Carroll also stated that Chambliss made a statement later that day in which he said that he was with a person named "Jonathan Evans" during the robbery, that Evans robbed the bank armed with a pellet gun that looked like a .45 caliber weapon, and that he, Chambliss, was unarmed when he went into the office where the two women were located. At trial, Chambliss acknowledged that he told the police that the Defendant's last name was Evans, but he testified that the Defendant was the person that he was with on the day of the robbery.
On appeal, briefs were filed by both the Defendant and the Defendant's appellate counsel. In both briefs, the Defendant alleges that the trial judge improperly denied his motion for a mistrial when two police officers subpoenaed by the defense failed to appear when called to testify, that his sentence is excessive, and requests a patent error review. In his pro se brief, he adds that the sentence was mistakenly imposed in light of the trial judge's comments at the initial sentencing hearing, that the trial judge prejudiced the Defendant's defense by making derogatory comments about the testimonial value of the defense witnesses, that the evidence related to the dog used by the canine unit was admitted without a proper foundation, and that he was denied effective assistance of counsel at the habitual offender hearing and sentencing because of double jeopardy.[2]

MISTRIAL OR RECESS
The Defendant contends that the trial judge improperly denied his motion for a mistrial based on the absence of Officers Keith Lacasio and Mike Ocman, who were subpoenaed, but failed to appear for trial. *186 The State responds that a mistrial is not the proper remedy for an absent witness. Rather, the State points out that the proper remedy is a motion for a recess, which the Defendant did not make. Additionally, even if he had made such a motion, the Defendant would not have been entitled to it.
The record reflects that the Defendant intended to call Officers Lacasio and Ocman after the testimony of the other three JPSO employees. After it was determined that Officers Lacasio and Ocman had been subpoenaed but failed to appear, the trial judge issued an attachment for both officers. The Defendant made a motion for a mistrial based on his argument that the two officers' testimony was important to establish the events leading up to the Defendant's apprehension. Specifically, he asserted that the testimony elicited from the officers who had just testified was "helpful to the Defense [sic]," but that he did not "know what those two missing officers are going to say." The trial judge denied the mistrial motion.
The Defendant recognizes that a witness's absence is not listed in La.C.Cr.P. art. 775, but asserts that a witness's absence nonetheless is within the purview of paragraphs 3 and 5 of La.C.Cr.P. art. 775(3) and (5). He also cites La.C.Cr.P. art. 709, which sets out the criteria for a recess.
La.C.Cr.P. art. 775 provides for a mistrial as follows:
A mistrial may be ordered, and in a jury case the jury dismissed, when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;
(5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial.
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.
A mistrial is a drastic remedy and, except in instances that a mistrial is mandatory, is warranted only when the defendant suffers substantial prejudice that deprived him of any reasonable expectation of a fair trial. State v. Harris, 00-3459, p. 9 (La.2/26/02), 812 So.2d 612, 617.
In State v. Bryant, 33,078, p. 6 (La.App. 2nd Cir.3/1/00), 754 So.2d 387, 391, the court rejected the defendant's argument that the trial court should have granted his mistrial motion based on the absence of a witness. The court found that the defendant failed to show that there was any ground for a mistrial, noting that the absence of a witness is not one of the grounds for a mistrial listed in Article 775. The court further found that a recess was not warranted because the defendant failed to show that the witness would ever be found and thus no recess would aid the defense.
We agree with Bryant to the extent that the mistrial statute does not apply to a missing witness under the particular facts of this case. The Defendant was *187 unable to state specifically what the witnesses would testify that would assist the defense. Thus, the Defendant failed to show either "a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law ...," or that, absent some specific reason for calling the officers, that it was "physically impossible to proceed with the trial in conformity with law ..." C.Cr.P. arts. 775(3) and 775(5).
La.C.Cr.P. art. 709 requires the trial judge to grant a continuance or recess[3] when:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
While Defendant met the due diligence requirement of paragraph three, he failed to meet the first requirement. To the contrary, the Defendant specifically asserted that he did not know what the officers would say. Further, he did not establish that it was probable that the officers would be available in the future. In State v. Stevenson, 02-0079, pp. 4-5 (La.App. 5th Cir.4/30/02), 817 So.2d 343, 346, this Court found no abuse of the trial court's discretion in denying a defendant's motion for a continuance on the basis of absent witnesses when the defendant failed to meet two of the three requirements of La.C.Cr.P. art. 709. Here, the Defendant failed to meet the statutory requirements for a recess and thus, would not have been entitled to one had he filed a motion for one.

TESTIMONY OF CO-DEFENDANT
In his pro se brief, the Defendant first asserts that the trial judge erred by entering into a plea bargain agreement with Robert Chambliss and coercing him to testify against the Defendant at the Defendant's trial, "to a degree pleasing enough to the State that the District Attorney would request the judge to reduce Chambliss' sentence from twelve and a half (12½) years to ten (10) years."
The record reflects that the Defendant did not raise this objection at trial. In order to preserve the right to appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. La.C.Cr.P. art. 841. Both this Court and the Louisiana Supreme Court have recognized that a new basis for an objection may not be raised for the first time on appeal. State v. Cooks, 97-0999, p. 11 (La.9/9/98), 720 So.2d 637, 644, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999); State v. Burdgess, 434 So.2d 1062, 1067 (La.1983); State v. Winfrey, 97-427, p. 23 (La.App. 5th Cir.10/28/97), 703 So.2d 63, 77, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict, then resorting to appeal on errors that might easily have been corrected by an objection. State v. Rodriguez, 02-334, *188 p. 42 (La.App. 5th Cir.1/14/03), 839 So.2d 106, 134, writ denied, 03-0482 (La.5/30/03), 845 So.2d 1061. Since the Defendant did not raise this objection at trial, he failed to preserve the issue for appellate review.
Even had the Defendant properly preserved this issue for appeal, we would be precluded from reviewing it because the record does not contain the transcript of chambliss's guilty plea that the Defendant quoted from in his brief. The courts of appeal have no authority to receive or review evidence not contained in the district court record. State v. Oubichon, 422 So.2d 1140, 1141 (La.1982); State v. Bibb, 626 So.2d 913, 924 (La.App. 5th Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188.

IMPROPER COMMENTS
The Defendant next asserts in his pro se brief that the trial judge improperly commented on the value of the testimony by the defense witnesses. The comment referred to by the Defendant occurred in the context of the bench conference regarding the absent officers who had been subpoenaed by the defense, as follows:
MR. TOUZET [defense counsel]:
But, you know, one out of the three gave me some great stuff that Ithat I needed, and so I don't know what these last two are going to do.
THE COURT:
I must have been asleep.
MR. TOUZET:
Hey man, great stuff for me. One man's trash is another man's treasure.
THE COURT:
You got a lot of trashy treasure.
Thereafter, the bench conference concluded and the attorneys returned to their seats. Although the Defendant asserts that the jury and spectators laughed out loud at the comment, the record is devoid of any evidence of laughter in the courtroom. Also, the record does not reflect that the comment was overheard by the jury. In addition, the Defendant failed to object to the comment. Thus, he failed to preserve the objection for appellate review. La.C.Cr.P. art. 841.

LACK OF FOUNDATION
Next, the Defendant contends that the State failed to present any foundation for the testimony that the Defendant was apprehended after being tracked by the canine unit dog.
The record reflects that the Defendant did not object to any of the testimony regarding the use of the dog and the dog's discovery of the Defendant on the staircase. Again, the Defendant is precluded from raising this objection for the first time on appeal. C.Cr.P. art. 841. In addition, we note that defense counsel questioned the officers about the dog's part in the apprehension of the Defendant.

INEFFECTIVE COUNSEL
The Defendant contends that his trial counsel was ineffective because he failed to file a motion to quash the habitual offender bill of information on the basis that double jeopardy principles precluded his sentence from being enhanced as a third felony offender.
A defendant is entitled to effective assistance of counsel under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. In assessing a claim of ineffective assistance of counsel, a two-pronged test is employed. The Defendant must show that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced him. Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); State v. Smothers, 02-277, p. 12 (La.App. 5th *189 Cir.12/30/02), 836 So.2d 559, 567. The error is prejudicial if it was so serious as to deprive the Defendant of a fair trial, or "a trial whose result is reliable." Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; Smothers, 02-277 at 12, 836 So.2d at 567.
In order to show prejudice, a defendant must demonstrate that the outcome of the trial would have been different, but for counsel's unprofessional conduct. Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; Smothers, 02-277 at 12, 836 So.2d at 567. Effective assistance of counsel does not mean errorless counsel, or counsel who may be judged ineffective on mere hindsight. State ex rel. Graffagnino v. King, 436 So.2d 559, 564 (La.1983). However, there is no precise definition of reasonably effective assistance of counsel and, thus, any inquiry into the effectiveness of counsel is specific to the facts of the case. State v. Peart, 621 So.2d 780, 787 (La. 1993); Smothers, 02-277 at 12, 836 So.2d at 567.
Generally, an ineffective assistance of counsel claim is addressed through an application for post-conviction relief, so as to afford the parties an adequate record for review. Peart, 621 So.2d at 787. However, the Court can address the issues if the record contains sufficient evidence to decide the issue, and the issue is properly raised by assignment of error on appeal, State v. Hamilton, 92-2639 (La.7/1/97), 699 So.2d 29, 31, cert. denied, 522 U.S. 1124, 118 S.Ct. 1070, 140 L.Ed.2d 129 (1998); Smothers, 02-277 at 13, 836 So.2d at 567. In this case, the issue is easily addressed.
The United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life and limb." La. Const., art. I, § 15. Accord, La.C.Cr.P. art. 591. However, a defendant is not subjected to double jeopardy when his sentence is enhanced pursuant to La.R.S. 15:529.1. State v. Dorthey, 623 So.2d 1276, 1279 (La.1993); State v. Davis, 02-387, p. 12 (La.App. 5th Cir.9/30/02), 829 So.2d 554, 561. See also, Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 1188, 155 L.Ed.2d 108 (2003), recognizing that the United States Supreme Court has rejected double jeopardy challenges to recidivist statutes.
Based on the jurisprudence holding that double jeopardy protections do not apply to habitual offender proceedings, we find that Defendant's counsel was not ineffective for failing to file a motion to quash the bill of information on the basis of double jeopardy.

EXCESSIVE SENTENCE
The Defendant contends that his 66 year enhanced sentence as a third felony offender is constitutionally excessive.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992); State v. Terrase, 02-1009, p. 6 (La.App. 5th Cir.2/25/03), 841 So.2d 947, 951.
It is presumed that a mandatory minimum sentence under the Habitual Offender Law is constitutional. State v. Johnson, 97-1906, p. 6 (La.3/4/98), 709 So.2d 672, 675; State v. Williams, 01-1007, p. 11 (La.App. 5th Cir.2/26/02), 811 So.2d 1026, 1032. However, if the trial judge finds that an enhanced punishment mandated by La.R.S. 15:529.1 makes no "measurable contribution to acceptable goals of punishment" or that the sentence amounts to nothing more than "the purposeful imposition of pain and suffering" and is *190 "grossly out of proportion to the severity of the crime," the trial judge has the option and duty to reduce such sentence to one that would not be constitutionally excessive. State v. Dorthey, 623 So.2d 1276, 1280 (La.1993).
A trial judge may only depart from the mandatory sentence if he finds clear and convincing evidence that would rebut the presumption of constitutionality. Johnson, 97-1906 at 7, 709 So.2d at 676; Williams, 01-1007 at p. 11, 811 So.2d at 1032. However, the burden is on the defendant to rebut the presumption of constitutionality by showing that he is exceptional because of unusual circumstances and that the sentence is not meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Johnson, 97-1906 at p. 8, 709 So.2d at 676, quoting State v. Young, 94-1636, pp. 5-6 (La.App. 4th Cir.10/26/95), 663 So.2d 525, 528, writ denied, 95-3010 (La.3/22/96), 669 So.2d 1223. The Louisiana Supreme Court has cautioned that downward departures from the mandatory minimum sentences should be made only in rare cases. State v. Lindsey, 99-3256, p. 5 (La.10/17/00), 770 So.2d 339, 343.
As a third felony offender, the Defendant was subject to a sentence of not less than two-thirds of the longest term and not more than twice the longest term for the underlying felony.[4] La.R.S. 15:529.1(A)(1)(b)(i). Armed robbery is punishable by not less than ten nor more than 99 years of imprisonment at hard labor without benefit of probation, parole or suspension of sentence. La.R.S. 14:64(B). Thus, the Defendant faced a sentencing range between 66 and 198 years of imprisonment at hard labor.
In this case, the Defendant failed to meet the guidelines set out in Johnson and Lindsey for the sentence to be declared unconstitutionally excessive. The Defendant does not even acknowledge on appeal that he received the mandatory minimum sentence and does not offer any reason to support his allegation that the sentence is excessive. Further, the Defendant did not make any argument at the sentencing hearing or in his motion to reconsider sentence to rebut the presumption of the constitutionality of the mandatory minimum 66 year enhanced sentence. Therefore, we find that the trial judge did not err in sentencing the Defendant to 66 years.
The Defendant also argues that the trial judge erroneously and unintentionally sentenced him to 66 years of imprisonment as a third felony offender. He argues that the trial judge actually intended to impose an enhanced sentence of not more than 51 years based on his comments in the original sentencing hearing.
Immediately after sentencing the Defendant to 41 years of imprisonment for the armed robbery conviction, the trial judge stated:
If the State seeks the multiple bill, I probably will consider it, and if they're successful in proving a triple bill, I'm going to go from forty-one (41) years to *191 fifty-one (51). I'm not going to do the maximum of ninety nine (99.)
I can forewarn the State now, so they can make the decision if it's worth going after.
The trial judge's remarks indicate that he did not intend to impose the maximum sentence on the Defendant if the State billed the Defendant as a third felony offender. However, he referred to the incorrect sentencing range. At the habitual offender sentencing, the trial judge correctly stated that the sentencing range for a third felony is between 66 and 198 years. Considering that the sentencing ranges mentioned by the trial judge at the original sentencing are not reflective of the sentencing range for a third felony offender, it is reasonable to infer that the trial judge simply made a mistake, although it is clear he did not intend to impose the maximum sentence. He then imposed the correct, mandatory minimum sentence of 66 years at the habitual offender enhanced sentencing. Despite the Defendant's contention to the contrary, we find that the trial judge did not mistakenly impose the 66 year sentence.

PATENT ERROR
The record was reviewed for patent error pursuant to La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337 (La.1975) and State v. Perrilloux, 99-1314 (La.App. 5th Cir.5/17/00), 762 So.2d 198. The review reveals no patent errors in this case.
Accordingly, the Defendant's conviction and sentence are hereby affirmed.
AFFIRMED.
NOTES
[1] Robert Chambliss (Chambliss), was charged as a co-defendant.
[2] We note that the Defendant filed a pro se brief raising five assignments of error in this Court on June 9, 2003. On the same day he filed a motion for the production of a copy of his transcript and requesting to file another pro se brief raising an additional four assignments of error. We ordered the Defendant to file his brief by July 10, 2003 and noted that the transcripts were previously provided. On July 15, 2003, the Defendant filed a supplemental brief. However, it is identical to the first pro se brief and does not raise any additional issues.
[3] Even though Article 709 refers to a continuance based on the absence of a witness, the same criteria apply for obtaining a recess. See, State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 877, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999).
[4] We note that, if the Defendant had committed the armed robbery before June 15, 2001, he would have been subject to a mandatory life sentence as a third felony offender. Prior to 2001 La. Acts 403, § 4, effective June 15, 2001, the habitual offender statute mandated life imprisonment for third felony offenders when the underlying or any of the predicate felonies were crimes of violence, or other qualifying offenses that are not present here. As of the 2001 amendment, a third felony offender is subject to a mandatory life sentence only if the underlying and the two predicate offenses are qualifying offenses. See, LSA R.S. 15:529.1(A)(1)(b)(ii).